UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

====================================================

United States of America

              v.

Michael Jones,

                      Defendant.

**Report and Recommendation**

15-CR-133S

====================================================

## I.   INTRODUCTION

On the night of March 7, 2015, police officers spotted defendant Michael Jones ("Jones") at the open hood of his vehicle.  The officers asked Jones what he was doing and suspected, though never saw, that he was hiding something in his left hand.  The officers told Jones to show his hands; he did, but in a way that the officers considered unusual.  When one officer began to step out of his patrol car and told Jones to approach the patrol car, Jones fled.  The officers caught Jones and found him with a quantity of cocaine base.

When was Jones "stopped" or "seized" for Fourth Amendment purposes?  Jones has filed a motion to suppress (Dkt. No. 20 at 17) arguing that he was seized when he was told to show his hands.  Picking that point for Fourth Amendment analysis is important to Jones because, according to him, the police officers then lacked particularized suspicion of criminal wrongdoing.  If so then evidence obtained after that point would have to be suppressed.  The Government counters that "no search or seizure occurred of the defendant until he fled and began to discard what appeared to be controlled substances, law enforcement was simply investigating an apparent disabled vehicle on a public highway and while there can be no rational objection to the police investigating a possibly disabled vehicle roadside, such consideration need not be taken by this

Court, as there was no invasion of the defendant's personal security prior to his flight from his vehicle." (Dkt. No. 36 at 4.)

The Court received a case referral from Judge Skretny on July 9, 2015. (Dkt. No. 2.) The Court held oral argument on March 3, 2016 (Dkt. No. 25) and a suppression hearing on April 7, 2016 (Dkt. No. 29). For the reasons below, the Court respectfully recommends granting Jones's motion.

## II.    BACKGROUND

### A. Case Generally

This case concerns fairly straightforward allegations that Jones possessed cocaine base on March 7, 2015 with intent to distribute. The case began with a single-count indictment that the Government filed on July 9, 2015. (Dkt. No. 1.) In the lone count, the Government accused Jones of possession with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The Court arraigned Jones on July 16, 2015. (Dkt. No. 5.) On July 22, 2015, the Court held a detention hearing and ordered Jones detained without prejudice as a flight risk and a danger. (Dkt. No. 8.)

On February 12, 2016, Jones filed omnibus pretrial motions. (Dkt. No. 20.) All but one motion was non-dispositive in nature. The Court denied Jones's non-dispositive motions as moot once he reported that he received all requested pretrial discovery and that he considered his non-dispositive motions fulfilled. (Dkt. Nos. 25, 26.) The only remaining motion is a dispositive motion to suppress evidence that the Government obtained against Jones through a series of events on March 7, 2015. The Court will review the suppression motion in further detail below, based on the parties' papers and the suppression hearing that occurred on April 7, 2016.

2

### B. *Events of March 7, 2015*

The events central to Jones's suppression motion and to the entire case began around 10:30 PM on March 7, 2015. That evening, Jones had been visiting his mother at her house on 139 Westminster Avenue in the City of Buffalo, New York. Jones had his one-year-old child with him. Jones and his child left his mother's house around 10:30 PM and proceeded to the vehicle that Jones had parked not too far away on Westminster Avenue. The vehicle was a 2015 Ford Explorer; the record is not clear as to what color the vehicle was. (*Compare* Dkt. Nos. 24 at 11 *and* 36 at 2 (white) *with* Dkt. No. 35-1 at 1 (black).) After putting his child in a car seat, Jones started the vehicle. As he was about to start driving, Jones "smelled something unusual coming from the vents" of the vehicle. (Dkt. No. 20-1 at 1.) The smell prompted Jones to exit the vehicle and to look under the hood. Jones was looking under the hood on the passenger side of the vehicle, which would have placed him at or near the curb.

Jones stayed under the hood of his vehicle long enough to draw police attention. Around 10:44 PM, Buffalo Police Officers William Robinson ("Robinson") and Anniel Vidal ("Vidal") were on routine patrol, driving down Westminster Avenue in the opposite direction in which Jones's vehicle was parked. (Dkt. No. 31 at 10.) Robinson was driving and Vidal was in the passenger seat. The officers noticed Jones under the hood of his vehicle and pulled up to the vehicle, "driver's side to driver's side." (*Id.*) The testimony varied slightly, but the police car pulled up about 10 or 20 feet from where Jones was standing. (*Id.* at 18, 30.) Robinson observed that Jones "was bent over and he was facing kind of away from us." (*Id.* at 10.) Robinson did not see Jones with any tools, flashlights, mechanic lights, tire jacks, or other indicia of car maintenance or roadside car service. (*Id.* at 15–16.) Robinson then asked Jones something to the effect of, "What

3

are you doing" or "What is going on." (*Id.* at 10, 17.)  Robinson did not ask whether Jones needed

assistance.  (*Id.* at 17.)  Robinson conceded that, up to this point, there was nothing suspicious

about Jones being under the hood of his vehicle "[b]esides the fact that that's an actual city

ordinance for working on your vehicle in the street." (*Id.* at 15; *but see id.* at 24 ("At this point we

weren't sure if he was fixing the car or he was just leaning in that area.").)  Vidal testified that

"when we see a vehicle with the hood up we're assuming they're doing some kind of maintenance

of the vehicle in the streets with—there's a city ordinance for fixing cars in the streets, and we just

stopped to make sure everything was okay." (*Id.* at 25.)

       The next step in the events of March 7, 2015 was Jones's reaction to Robinson's question

about what he was doing.  The record does not indicate that Jones said anything to answer

Robinson's question.  Instead, Jones "kinda bladed his self [sic] away from me as if he was hiding

something." (*Id.* at 11.)  Robinson explained that "blading" meant that "[o]ne side of his body is

facing me and the other side is not.  So he's not square when you're, you know, when you're

face-to-face with someone . . . . he was, you know, positioning himself in that way and hiding

something." (*Id.*)  Robinson inferred an attempt by Jones to hide something based on his law-

enforcement experience.  "I would say in law enforcement, but I'm saying in life too[,] honestly.  If

someone is like facing away from you, you would assume that they're trying to hide something

from you." (*Id.* at 19.)  Vidal added the detail that "as our car—as he recognized —as he saw us, he

concealed his hands." (*Id.* at 30.)  Vidal also testified that Jones concealed his right hand (*id.* at

31), but given the officers' position and Robinson's testimony about Jones's positioning, Jones

would have had a better chance of using the body of his vehicle to conceal his left hand.  In fact,

4

Jones's local court complaint mentioned his left hand.  (Dkt. No. 35-1 at 1.)  Jones's alleged

blading prompted Robinson to tell Jones to show his hands—"let me see his hands or what do you

have, something like that.  I don't exactly remember the exact words."  (Dkt. No. 31 at 19.)  Jones

complied with Robinson's directive, but not to the officers' satisfaction.  Jones showed his hands

and had nothing in them.  (*Id.* at 20.)  Nonetheless, Robinson became concerned that Jones "kind

of raised his hands, but he kept his elbows to his side, but his hands coming up and you could see

that he was still kind of—I don't know, tucking or hiding something on his side."  (*Id.* at 12.)

Robinson wondered whether Jones had placed something from his hands between his elbows and

body, though he saw nothing fall away from Jones later.  (*Id.* at 21.)  In Vidal's words, Jones "did

make the motion to show his hands, but at the same time he kept his elbows close to his body,

bringing his hands up slightly."  (*Id.* at 26.)  Vidal considered Jones's gesture unusual.  (*Id.*)  The

local court complaint made no mention of body language involving elbows; it said only that

"officers asked defendant to show his hands, the defendant did comply."  (Dkt. No. 35-1 at 1.)

    The last step in the events of March 7, 2015 is more or less undisputed.  Suspicious about

Jones's alleged body language or gestures, Robinson opened the door of the police car and began

to exit the car to approach Jones.  (Dkt. No. 31 at 12.)  Vidal could not recall any statements (*id.* at

33), but the local court complaint contained the detail that "as Officer Robinson exits vehicle he

orders the defendant to approach patrol vehicle."  (Dkt. No. 35-1 at 1.)  Robinson's exiting of the

patrol car and order to Jones appear to have been roughly simultaneous.  Jones reacted to

Robinson by taking flight.  (Dkt. No. 31 at 12.)  Vidal chased down Jones on foot while Robinson

went back into the patrol car to pursue Jones on the road.  (*Id.* at 13.)  The officers caught Jones,

5

arrested him on the ground, and found "crack rocks" near his person.  (*Id.* at 14.)  More specifically, Vidal caught Jones on foot, "at which point I tackle him, he drops a black bag, I look in the bag and I see crack cocaine."  (*Id.* at 28.)  During the chase, Jones was "doing something with his hands, looks like he's tearing something up.  At the same time like a dust cloud is sort of forming and I'm basically tasting whatever it is that he's breaking apart."  (*Id.* at 27.)

Jones makes two arguments in favor of suppression.  Jones argues that the officers cannot base any reasonable suspicion on any violation of city ordinances because reasonable suspicion must relate to criminal activity.  A violation of a city ordinance, in contrast, would amount to a violation at most.  Additionally, Jones argues that any voluntary conversation ended with the directive to show his hands.  Jones "submitted to authority when he stopped looking at his car and when he showed his hands.  At this point, he is seized unlawfully and everything after that point is considered fruits of a poisonous tree."  (Dkt. No. 35 at 4.)  The Government agrees that a "seizure" for Fourth Amendment purposes eventually occurred, but not at Jones's vehicle.  "In the case of Mr. Jones, no search or seizure occurred of the defendant until he fled and began to discard what appeared to be controlled substances, law enforcement was simply investigating an apparent disabled vehicle on a public highway and while there can be no rational objection to the police investigating a possibly disabled vehicle roadside, such consideration need not be taken by this Court, as there was no invasion of the defendant's personal security prior to his flight from his vehicle. Seizure occurs when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen."  (Dkt. No. 36 at 4.)  Alternatively, the Government

argues that even if an unreasonable seizure occurred at Jones's vehicle, subsequent events can and in fact did justify the seizure retroactively.

## III.   DISCUSSION

Jones is not litigating any events that occurred once he began to flee, leaving three major events for the Court's consideration: the initial police sighting of Jones and Jones's alleged concealing of his hands; the police asking Jones what he was doing and Jones's alleged repositioning or "blading" of his body; and the police directing Jones to show his hands and Jones's body language with his elbows.  To obtain suppression of the evidence from the night of March 7, 2015, at least one of the above events has to constitute both a Fourth Amendment seizure and a seizure that occurred without reasonable suspicion.

Generally, "[t]he Fourth Amendment applies to seizures of the person, including brief investigatory stops . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417 (1981) (citations omitted).  "[T]he totality of the circumstances—the whole picture—must be taken into account.  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Id.* at 417–18 (citations omitted).  The Supreme Court in *Cortez* explained further what particularized suspicion means:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.  First, the assessment must be based upon all the circumstances.  The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.  From these data, a trained officer draws

7

inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.  Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 418.

The criteria from *Cortez* and similar case law about particularized suspicion never come into play, though, unless a Fourth Amendment "seizure" actually has occurred.  The Supreme Court has summarized the test for police conduct that rises to the level of a seizure:

A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement.  Thus, an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act.  A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.

When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not.  The test was devised by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544 (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *id.*, at 554 (principal opinion).  Later on, the Court adopted Justice Stewart's touchstone, but added that when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking

whether a reasonable person would feel free to decline the officers' requests or
otherwise terminate the encounter.

*Brendlin v. California*, 551 U.S. 249, 254–55 (2007) (internal quotation and editorial marks and

citations omitted).  Below the threshold show of authority, police officers may converse with

people on the street just as any private citizen can.  "Even when law enforcement officers have no

basis for suspecting a particular individual, they may pose questions, ask for identification, and

request consent to search luggage—provided they do not induce cooperation by coercive means.  If

a reasonable person would feel free to terminate the encounter, then he or she has not been

seized."  *United States v. Drayton*, 536 U.S. 194, 201 (2002) (citation omitted); *accord United States v.*

*Lopez*, 553 F. App'x 10, 12 (2d Cir. 2014) (summary order) ("Police officers may ask for an

individual's consent to a search, provided they do not induce cooperation by coercive means.

There is no indication in the record that [the officer] used coercive means.") (citing *Drayton*).

　　With these principles in mind, the Court will examine each of the major events in this case

in turn.

### A.  *Initial Police Sighting*

　　The initial moments of the events of March 7, 2015—when Robinson and Vidal first

noticed Jones and vice versa—most closely resemble an ordinary street encounter between private

citizens.  Robinson and Vidal were on routine patrol and not pursuing Jones.  Neither side said

anything to the other in those initial moments, the officers did not draw weapons, and the police

car's turret lights were not flashing.  *See Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)

(implying that "the show of authority represented by flashing lights and continuing pursuit" would

constitute an attempted seizure).  Although Robinson and Vidal coincidentally might have

stopped their police car in Jones's path had Jones been in his vehicle trying to pull away, they appear not to have made any effort to impede Jones's movement. *See Pane v. Gramaglia*, 509 Fed. App'x 101, 103 (2d Cir. 2013) (summary order) (noting that "a reasonable police officer would have known from established precedent that having a fellow officer pull a marked police car with activated turret lights behind Pane's parked car, thereby effectively blocking her movement, and directing the vehicle's spot light toward the interior of Pane's vehicle constituted a seizure that required reasonable suspicion") (citations omitted). That Robinson and Vidal failed to ask Jones whether he needed roadside assistance did not change the situation. Under these circumstances, nothing happened during the initial sighting of Jones that would implicate the Fourth Amendment. Without the Fourth Amendment in play, the Court does not need to consider here Robinson's testimony that he immediately considered a possible violation of a city ordinance.

### B. *Police Question to Jones*

By the next event in the sequence, Robinson and Vidal have pulled up to Jones's vehicle, the two sides have seen each other, and Robinson asked Jones what he was doing. Jones then repositioned or "bladed" his body in a way that caught the officers' attention. Up to this point, the officers still had not given orders, drawn weapons, flashed lights, or impeded Jones's mobility. Without some kind of show of authority, the events of March 7, 2015 up to this point still equated to a voluntary encounter between private citizens.

### C. *Police Directive to Jones*

The situation between the officers and Jones changed with the directive that Jones show his hands. The officers did not ask to see Jones's hands; they told him to show his hands because they believed that he was hiding something. Neither Robinson nor Vidal testified about what they

thought Jones might be hiding.  Nonetheless, telling Jones to show his hands constituted a formal

show of authority.  Jones acquiesced to the show of authority by showing his hands and revealing

that he had nothing in them.  *Compare United States v. Baldwin*, 496 F.3d 215, 217 (2d Cir. 2007)

(finding no submission to authority where officers "instructed Baldwin to show his hands, but he

simply stared back and refused to comply") *and Marcano v. City of Schenectady*, 38 F. Supp. 3d 238,

252 (N.D.N.Y. 2014) ("Even assuming that a reasonable person would not have felt free to leave

when the officers shined their spot light on him, told him to stop, got out of the car, commanded

that he show his hands, and even attempted to physically hold him when he and the officers

slipped on the ice after Plaintiff began to flee, Plaintiff did not submit to this show of authority.

Rather, it is undisputed that Plaintiff successfully fled when the officers first confronted him on

Mumford Street.  Like the defendant in *Baldwin*, Plaintiff did not submit to police authority and,

therefore, no actionable Fourth Amendment seizure occurred at the initial confrontation.") *with*

*United States v. Dorlette*, 706 F. Supp. 2d 290, 299–300 (D. Conn. 2010) (granting a suppression

motion where "the officers made 'a show of authority' by asking, without their weapons drawn, for

the men to show their hands, but Dorlette did not yield to this show of authority.  '[A] few

seconds' later, the officers repeated the command with their weapons drawn, in response to which

the men stopped and obeyed.  At the latest, then, the stop—a seizure—occurred when the officers

drew their service weapons.  This stop was justified by neither the events preceding the officers'

first show-hands order, nor between that order and their second show-hands order accompanied

by drawn service weapons.") *and U.S. v. Herring*, No. 07-CR-45A, 2008 WL 1986059, at *1

(W.D.N.Y. May 7, 2008) ("In any event, the defendant initially ignored the officers' request to put

his hands where they could see them and instead turned his back in an 'evasive manner' and walked away.  Under clear Supreme Court precedent, the defendant was not 'seized' for Fourth Amendment purposes until he complied with the officers' show of authority.").  From this point forward, Jones was stopped for Fourth Amendment purposes and his freedom of movement restrained.  "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance."  *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013); *see also United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005) ("The settled requirement is, of course, that reasonable suspicion must arise before a search or seizure is actually effected.").

The testimony about Jones having his elbows at his sides in a suspicious way is questionable for several reasons.  The local court complaint contained enough detail to mention Jones's repositioning to hide his left hand; presumably, it also would have included a similar detail about elbow body language but did not.  The Court hesitates to credit the officers with a recollection of a detail not in the local court complaint, given that Vidal could not remember which hand Jones concealed and given that, before and after the hearing, the Government continued to misstate the color of Jones's vehicle.  Additionally, Robinson and Vidal testified about elbow body language as a means of saying that Jones had something in his hands and pinned any objects between his elbows and body.  Robinson and Vidal, however, likely would have noticed some kind of gesture that would have placed any objects between Jones's elbows and body.  Robinson and Vidal did not testify to any such gesture.

As for the officers' concern about a violation of city ordinances, they were legally wrong. Both Robinson and Vidal testified to the effect of assuming, when they first saw Jones, a possible violation of a city ordinance prohibiting car maintenance in the street. The Court infers that Robinson and Vidal had in mind the city ordinance for which they cited Jones in the local court complaint, Buffalo City Code § 413-38. That ordinance reads in its entirety as follows:

> No person engaged in the garage business or in the business of repairing, manufacturing or selling automobiles or parts thereof or supplies therefor, or any business affecting in any manner automobiles or vehicles, shall, except as otherwise expressly provided for by law or ordinance, use any part of any street or other public place for the storing, exhibiting, repairing or otherwise caring for automobiles or vehicles.

Buff. City Code § 413-38, http://www.ecode360.com/print/BU1237?guid=13626589 (last visited August 16, 2016). Jones was not engaged in any sort of garage or automobile business, and the officers testified that they saw no indicia of car repair that might have suggested a commercial enterprise. As a matter of law, Section 413-38 does not prohibit a driver from examining a possible mechanical problem with his own vehicle while it is parked curbside. Mistakes of law can support reasonable suspicion if the mistakes themselves are reasonable. *See Heien v. North Carolina*, ___ U.S. ___, 135 S. Ct. 530, 536 (2014); *United States v. Wilson*, No. 14-CR-128-A(SR), 2016 WL 1583860, at *2 (W.D.N.Y. Feb. 2, 2016) (finding a reasonable mistake of law where a police officer "relied on the statute as it was displayed on the computer in his squad car" and the display did not show a relevant statutory exception); *but see United States v. Mota*, ___ F. Supp. 3d ___, No. 1:15-cr-00254-GHW, 2016 WL 110527, at *10 (S.D.N.Y. Jan. 8, 2016) ("Because a burnt out top center brake light is not a traffic violation under New York law, and it is not an objectively reasonable mistake of law to conclude otherwise, Officer Gutierrez's stop of the Five Stars van violated the

Fourth Amendment."). Here, though, the suspected violation of a one-person commercial enterprise, around 10:44 PM, with no garage or tools present, was not reasonable. The suspicion about Section 413-38 thus cannot support any determination of reasonable suspicion.

With the testimony about Jones's elbow body language discounted as questionable and the suspicion of city ordinance violations rejected as unreasonable, the Court is left with the open vehicle hood by itself and Jones's blading as the basis for a particularized suspicion of wrongdoing. Jones's open vehicle hood, without context, conveyed little information to Robinson and Vidal that would have allowed them to distinguish criminal activity from a mechanical breakdown. *Cf. United States v. Pantoja-Soto*, 768 F.2d 1235, 1236 (11th Cir. 1985) (affirming reasonable suspicion where the opening of a vehicle hood was observed during direct surveillance of broader suspicious activity); *United States v. Palomino*, No. CRIM C-06-594, 2006 WL 3484273, at *3 (S.D. Tex. Nov. 29, 2006) (observation of "non-factory screws in the firewall" of an open vehicle hood can support reasonable suspicion). Body movements that attempt to shield activity from officers' view can create reasonable suspicion when part of a "factual medley" that includes details such as stepping away from police, a hunching, keeping a hand constantly on a waistband, and a direct observation of an unidentified object pulled from a waistband. *United States v. Hart*, 674 F.3d 33, 39 (1st Cir. 2012); *see also United States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011) (affirming reasonable suspicion; "In this case the totality of the circumstances are as follows: 1) the detention and search occurred at a location where officers had been recently informed that a black man was selling drugs; 2) defendant initially approached the officers in a calm way, but his demeanor subsequently changed once he realized they were police; 3) defendant acted nervously, 'like a deer at headlights';

14

4) defendant turned away from the officers as if to leave; and 5) defendant frantically dug his hands into his pockets and would not remove them."); *United States v. Galan*, No. 14-CR-450 RRM, 2015 WL 1602151, at *6 (E.D.N.Y. Apr. 9, 2015) ("Officer Cruz saw Galan, from behind, bending or squatting at the curb next to a parked minivan, and reach with his left hand toward his right waistband, remove what Office Cruz saw was a black object, and place that black object on the tire of the minivan. That gesture alone—removing an object from an area where guns are typically carried, and secreting that object on the tire of a parked car—in and of itself provided Officer Cruz with a particularized, reasonable and objective basis to conduct a *Terry* stop to further investigate.") (citations omitted). Additional contextual factors like the ones quoted above, though, are not present here. Robinson and Vidal also never saw an object in Jones's hands and never recovered anything that might have fallen from the side of Jones's body to the ground where he had been standing. *Cf. United States v. Mosley*, 743 F.3d 1317, 1328 (10th Cir. 2014) (finding that "furtive gestures consistent with hiding or retrieving a weapon in response to being confronted by police officers" can be a factor supporting reasonable suspicion, especially when combined with a 911 call and an anonymous tip); *United States v. Jones*, 606 F.3d 964, 967 (8th Cir. 2010) ("On cross examination, [the officer] admitted that he was unable to see the size or shape of whatever was in Jones's hoodie pocket, and that Jones exhibited none of the other clues Hasiak had been trained to look for, such as walking with an unusual gait, turning that part of his body away from the officers' view, adjusting his grip or the location of the item in his pocket, or running away."). Robinson and Vidal did not testify about the neighborhood being a high-crime area, and such information alone would not have been enough to raise Jones's blading to the level

15

of conduct justifying reasonable suspicion. *Cf. United States v. Padilla*, 548 F.3d 179, 187–88 (2d Cir. 2008) (affirming reasonable suspicion where the totality of the circumstances included a high-crime neighborhood plus an unusual pattern of walking and an unusual choice of an "isolated, dark path at night rather than stay[ing] on the lighted sidewalks"); *United States v. McDow*, No. S2 15 CR. 233 (PGG), 2016 WL 3636665, at *16 (S.D.N.Y. June 29, 2016) ("McDow's alleged nervousness and presence in a drug-prone location—considered together with Officer Kinane's unreliable testimony concerning his observations—do not amount to articulable facts suggesting that criminal activity may be afoot.") (internal quotation and editorial marks and citations omitted); *United States v. Parker*, No. 99-CR-123(JG), 1999 WL 997282, at *7 (E.D.N.Y. Oct. 18, 1999) ("Here, the conduct the officers perceived as evasive did not occur in circumstances that already had generated suspicion. There was no radio call to respond to the area; it was not a known drug or firearm location; no suspicious-looking activity had been observed; no bulges suggestive of hidden firearms were observed."). Interestingly, apart from the city ordinance that the Court has found did not apply, Robinson and Vidal never articulated what specific criminal activity Jones's blading indicated, other than "experience of being on the streets" guiding their judgment generally. (Dkt. No. 31 at 19.) "I would say that anyone, even if you have kids or just a regular person, if someone's facing away from you they're hiding something from you." (*Id.*) *Cf. Jones*, 606 F.3d at 966 ("[W]e find it remarkable that nowhere in the district court record did the government identify what criminal activity [the officer] suspected."). Considering the totality of the circumstances, Robinson and Vidal saw an open vehicle hood and one instance of blading, bypassed any consideration of roadside assistance, and assumed some kind of criminal activity

16

without specifying it at the time of the stop.  These circumstances did not suffice to provide

reasonable suspicion to warrant stopping Jones.  *Cf. Jones*, 606 F.3d at 967 ("We suspect that

nearly every person has, at one time or another, walked in public using one hand to 'clutch' a

perishable or valuable or fragile item being lawfully carried in a jacket or sweatshirt pocket in order

to protect it from falling to the ground or suffering other damage.  With only this circumstance to

support [the officer's] suspicion, though we are mindful of the need to credit law enforcement

officers who draw on their experience and specialized training, we conclude that too many people

fit this description for it to justify a reasonable suspicion of criminal activity.") (internal quotation

marks and citations omitted).

   The Court respectfully disagrees with the Government's principal analysis opposing

suppression.  Jones in fact "acted in a manner consistent with hiding something from the

police" (Dkt. No. 36 at 3), but Robinson and Vidal never specified what the "something" was at

the time of their show of authority, and the testimony about the elbow body language was

questionable for the reasons explained previously.  If Robinson and Vidal had not made a show of

authority until Jones's flight then *California v. Hodari D.*, 499 U.S. 621 (1991), likely would support

finding the flight a pre-authority factor that affected the determination of reasonable suspicion.

The Second Circuit has explained previously, however, that acquiescence to authority prior to a

flight makes a critical difference:

> *Hodari D.*, [*United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005)], and [*United States v. Muhammad*, 463 F.3d 115, 122 (2d Cir. 2006)] are distinguishable from this case. The rule from *Hodari D.*—"the grounds for a stop may . . . be based on events that occur after the order to stop is given," *Swindle*, 407 F.3d at 568—has been applied only in cases where the suspect attempts to flee from police after being ordered to stop.  *Hodari D.*, *Swindle*, and *Muhammad* all involved a police show of authority, a

> defendant who refused to comply by fleeing, police pursuit, and a "seizure" occurring at the moment the defendant was physically restrained. *Hodari D.*, 499 U.S. at 625–26; *Muhammad*, 463 F.3d at 122–23; *Swindle*, 407 F.3d at 572–73. The facts of this case, by contrast, involve an order to stop, compliance with that order, and a "seizure" at the moment [defendant] complied with the order. The arguably suspicious refusal to remove his hands came after he obeyed the order to stop.

*United States v. Simmons*, 560 F.3d 98, 106–07 (2d Cir. 2009). The distinction that the Second Circuit made in *Simmons* applies here. Robinson's directive that Jones show his hands constituted a show of authority and came before Jones's flight. The flight itself, therefore, cannot be considered when assessing reasonable suspicion.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Jones's motion to suppress. (Dkt. No. 20 at 17.)

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 16, 2016